The next case for argument is 22-1291, Bot M8 v. Sony Interactive. Just for the record, as we all know and agree, Lady Amapitio has dropped out of this argument in light of the issue. Mr. Franco, whenever you're ready. Good morning, Your Honors. May it please the Court. The final written decision should be reversed because it was based on an erroneous claim construction. The Board found, contrary to the very purpose of the 540 patent, that unauthenticated, untrusted data could be copied into the memory of the mug board. The entire point of the 540 patent and its distinction over the prior art was to first authenticate the data that came on this untrusted, removable source, and only after the authentication process is completed can that formerly untrusted data be copied into the RAM memory of the motherboard, which is inherently trusted. Okay. I mean, maybe, I hope this question makes sense because I'm not clear. I'm understanding everything that's going on here. But it seems to me that everyone agrees that game programs can't be written to the motherboard before authentication, right? Is that a correct statement? Is that what the construction was? That is correct. So the Board found that under that view, whatever Johnson and Morrow, the pieces of prior art, wrote to the motherboard before authentication, it wasn't a game board, a game program. That's the Board problem, right? Just follow me step by step. I, okay, I don't agree, but I understand what you've said. The Board's construction was that the entirety of the game program cannot be copied into memory until authentication is complete. That, in particular, the Board's claim construction was that claim one does not the game program from being written to RAM to facilitate the authentication of the game program, and that that's Appendix 40. The critical point, the Board did not agree that no portion of the gaming information can be read into RAM from the mass storage device prior to authentication. Okay. So where in your briefing did you demonstrate that what Johnson and Morrow right before authentication is really a portion of the game program, and that no reasonable back line is included? Otherwise, what was the argument made? Well, we did not advance a substantial evidence argument on that point, but what we did explain... You didn't argue claim construction at all, correct? No, below, we did argue claim construction. I mean, this was from the final written decision. This was the Board's characterization of the argument in the issue. Again, this is Appendix 40. I'm sorry, Appendix 40? Yes, 40. Patent owner seeks to read into claim one a requirement that nothing related to or any portion of the gaming information be read into RAM from the mass storage device of Johnson prior to authenticating the gaming program. So, counsel, just to clarify, you argued claim construction on other terms, but not this term in particular. Is that right? The two terms that were argued were read and write, and they reflect this claim construction issue. And the reason, you know, the IPR proceeding, there was a bit of a moving target as far as petitioner's position. Petitioner seemed to be saying originally that the gaming program could be copied into information, and then they backtracked from that. So, during oral argument, both sides clarified the claim construction issues. There was a concession from Sony's counsel during their presentation, but the Board clearly understood the salient claim construction dispute, which from the passage I just read, you know, patent owner seeks to read into claim one a requirement. That's clearly a claim construction issue, not a factual issue. And that requirement was that no portion of the gaming information could be read into RAM prior to the completion of authentication. Now, there was actually no dispute in the case. Even Sony's expert agreed that the way that Johnson authenticates the gaming data is by copying it in chunks into RAM and then generating a checksum. I'll give you the site for his concession on that point. That was Appendix 1798. This is during his deposition at 45.2 through 46.11. And his testimony was that a person of ordinary, he didn't use the word person of ordinary skill in the art, but this is what he said, that a person of ordinary skill in the art would understand that the way this checksum is generated is by taking chunks of the gaming data, loading it into memory, and then running a hash on it and get a number. And then you compare that to the authentication number that's also found on the device. That's the old... So, counsel, do you agree that the board distinguished writing the game program into memory from writing game data more generally? Do you agree with that statement? I do. And that was the error. Yes, I agree. And that was part of the error of the board's claim construction because the patent itself uses the term gaming information. And it's referring broadly not just to the game that you would play, but the data associated with it. But the board also found on Appendix 40 that portions of the gaming program could be copied into memory. And Sony's expert conceded that that, in fact, is how Johnson and, for that matter, Morrow authenticate the gaming programs. And the problem with that approach is the very problem the 540 patent was trying to avoid, which is once you've copied the suspicious, untrusted code into your RAM memory, the damage can be done. Now, one of the primary applications of this technology was in casino games like slot machines. And the game designers wanted the flexibility that you could just put a chip into the game and change it. So it's a new look. It's exciting. But the concern is that a malicious actor might remove the chip, make some modifications to the code, slip it in, and then start stealing money from the casino. So it's a more paranoid paradigm of security where nothing goes into the motherboard memory, this is said throughout the 540 patent, until the authentication process is complete. And respectfully, the board construed the claim incorrectly to allow both associated data, which means you're still reading data from the board, the untrusted board, into RAM memory that hasn't been verified. And the damage could be done at that point. That's number one. And number two, that the process is not completed and gaming information itself is being brought in and being processed with this check zone process to authenticate it. Now, the claims refer to game program, right? Not gaming information. Correct. So the claims talk about a specific sequence and a causal relationship, which is that the gaming program is authenticated and then the gaming program is copied into memory. So to anticipate that claim, something has to be first authenticated and then copied into memory. And there's no disclosure in Johnson or in Morrow of first completing the authentication process for the game and only then copying it into memory. So that is the error of the board's construction. Well, why is that a substantial evidence question? Because didn't the board conclude that Johnson and Morrow write before authentication is really a portion of the game program, what they write before authentication? No, that was not the board's conclusion. I mean, the board's conclusion was that the fact that data was being copied into RAM memory was not relevant because it wasn't the entire gaming program. And that is not a question of substantial evidence. It's a question of the meaning of the claims. I apologize for repeating myself, but the key passage in the final written decision is on appendix 40, where the board says, we've seen the arguments that patent owner's making, but we disagree because they seek to claim one requirement. That's a question of claim construction that nothing related to or any portion of the gaming information be read into RAM. That's where they got it wrong. I guess what I'm struggling with here is you never asked to construe game program, right? Like just so I make sure I have my facts right. Is that true? It was not a section of the brief where we said this term needs to be construed. And there were other terms you said needed to be construed, right? That is correct. But throughout the proceeding, and in particular during the trial itself, when the party's positions on this issue were clarified, we made clear our position, Sony made clear its position, and the board agreed with Sony, to our chagrin, that the claims, you know, BopMate's view is that the claims preclude writing even a portion of the gaming program into memory, which it's undisputed happens, and that related data from the untrusted media source can't be copied into memory. Sony disagreed, and the board agreed with Sony, as it makes crystal clear in the final written decision. And that was a consequential, and in this case, dispositive claim construction error that the board made. Can you just clarify something for me? Blue, at I think 17, you say the board adopted a contrary construction, finding the claim line does not broadcast the same data or other files, other than the game program, for being written to RAM to facilitate the authentication of the game program. So that's your view, the or other, or files other than the game program? Is that your construction? I'm sorry, Your Honor, I didn't follow. Is that your construction? Our construction is, as the board put it in rejecting it, that nothing related to, and no portion of the gaming information can be read into RAM. Well, what is or other files other than the game program? Do you think the terms should be construed to preclude data other than the game program from being written to RAM? Was that your construction? That was our construction. So there's two parts. Well, it's no data, a simple way of putting it is no data can be copied from the untrusted source into the motherboard's RAM until the authentication process is complete. And that includes not copying in portions of the gaming program, and it includes not copying in other data from the untrusted source. Files other than the game program. Correct. So that was your construction, which you say the board rejected. Okay. And you want us to adopt your construction in order to resolve it. Correct. Wasn't this issue treated or the subject of, let's call it a battle of the experts. And on this issue, you credited the expert testimony for that. There were many disagreements between the experts, but the experts for both sides agreed that at least a portion of the gaming data, and certainly other data from the untrusted source. I guess my point is that part of the final written decision was the board based it on the credibility of Sony's expert. And we can't review that credibility determination. Well, before the board even got to the factual opinions of the experts, the board made an erroneous claim construction. Had the board applied the correct claim construction, which is that nothing can be taken from the untrusted source and put into RAM, then in that case, there would have been no dispute. On this point, you argue for particular claim construction? Correct. We argued throughout the proceeding, including during the trial, that nothing can be copied from the untrusted source into memory. And it's, again, in appendix 40, the board made very clear its understanding of Botmate's proposed construction. It rejected Botmate's proposed construction. It said that that's not a requirement of the claims. It's not a factual finding. It's not an expert issue. It's a claim construction finding. But didn't the board find that whatever Johnson and Morrow wrote to the motherboard before Roth's identification, it wasn't the game program? So they made that finding with respect to the prior art, right? The only finding from the board was that the- Well, am I right? I mean, look at A37. The finding of the board, while I pull that, is that the entirety of the gaming program was not loaded into memory. That's not the same thing as finding that no portion of it was read in. And in response to the concession of Sony's expert that portions of the data are read into RAM memory before authentication, the board's response was, it doesn't matter because there's no requirement precluding that from being the case. But that's the error in the board's claim construction. I'm sorry, Your Honor. You said 830? 837. But you were agreeing with me that the board did conclude that Johnson and Morrow wrote to the motherboard before authentication. Whatever it wrote, it wasn't the game program. No, I respectfully disagree. All that the board said is the full program as a whole is not loaded into RAM until the authentication process is complete. But there was no- it's not even that they made a finding on the other way. There was no dispute between the parties that portions of the gaming program are loaded into RAM so that the verification can take place. Do you want to briefly address the two CPU claims issue? Briefly? Sure. And, you know, should you agree with us in reverse on the issue of claim construction, that would resolve the two CPU claims as well? All of the challenge claims, including those requirement- the point on the two CPU claim issue is that there was no prima facie case of obviousness because there's no reference that had the idea of having two separate CPUs for running two separate authentication programs. That's- for those claims, that's the key inventive concept. And it was just purely being filled in with hindsight by saying, you know, there's one reference that said- What about the Martinek reference? The Martinek reference talks about using an external source for authentication. It doesn't talk about using two CPUs for authentication, and it doesn't talk about using two authentication programs, a preliminary authentication and then the full authentication. So it's not even really close to what these claims are talking about. The two CPU claims have this super paranoid security system, which is we have this- it's like a security guard before you can even come into the building that's going to first validate the authentication program. And if that authentication program is validated, then it's allowed to come in and access the main CPU on the motherboard for the authentication process. That's- there's nothing with that concept in any of the cited prior art references. Okay, we'll get our vote over your rebuttal. So let me hear from the other side and we'll restore a little time. Thank you, Your Honor. Good morning, and may it please the Court. Appellant's claim construction cannot be correct, and here's why. If you look to Claim 1, Claim 1 lays out a couple different components. It lays out a board and a motherboard. Both the board and the motherboard have a memory, and then it lays out two different programs. There's an authentication program, and then there's also a game program in Claim 1. Claim 1 then goes on to articulate several steps for how this system is going to operate. And in those steps, the authentication program is read over from the board to the motherboard. Then, of course, that authentication program is used to perform the authentication process. And then only after that authentication process is successful is the game program moved over. So Appellant's construction, they would have this court hold that nothing related to or any portion of the gaming information be read into RAM prior to authentication. And what is your alternative construction that you understand that the board adopted? Yes, the alternative construction is this. Claim 1 does not broadly preclude data or files other than the game program from being written to RAM to facilitate the authentication. So the game program cannot be moved prior to authentication. So the deadline, the daylight between you and the other side is the game program versus his. Anything related to the game program? Exactly, Your Honor. And here's the linchpin of that. In Claim 1, Your Honor, the authentication program is defined as an authentication program, quote, for authenticating the game program. So as laid out in Claim 1, it is related to the game program. The authentication program is for authenticating the game program. And so it cannot be true that nothing related to the game program can be communicated over prior to authentication. The authentication program must be communicated over from the board to the motherboard prior to authentication. Well, and what about, I mean, look at 40, which your friend was pointing us to in terms of the way the board characterized the patent owners. Yes, Your Honor. It says, the requirement that they rejected, which is nothing related to or any portion of the gaming information. Are both of those pieces, does the board disagree with both of those pieces? Nothing related to. Nothing related to, Your Honor. Is gone, or in their view. Yes. Any portion of the gaming information? What is that? That's not especially clear in that portion of the record, Your Honor, but the board does go on to say right after that, in that final written decision, that their construction is that Claim 1 does not broadly preclude data or files other than the game program. So the focus, Your Honor, is on the game program. The board never holds that portions of the game program can be moved over prior to authentication. And what is nothing related to? What does related to mean? What is the scope of related to? That's our concern, Your Honor. That's appellant's position is that nothing related to can be communicated prior to authentication. And that's our concern, is the authentication program is communicated over prior to authentication, and it is related to the game program as defined in Claim 1. And then just walking through the steps of where the board was, and then they looked at the prior art, and they said the prior art does what, which makes it relevant to this? Yes, Your Honor. So the board concluded, starting with the Johnson analysis, the board concluded at Appendix 36 and 37, Johnson writes the game program in the system RAM only after verification of the files on the mass storage devices successfully completed. So the game program is communicated only after the authentication process is complete, and that's just like Claim 1. And there's substantial evidence in the record that supports that, Your Honor. So in Johnson Am I correct that Dr. Wolfe testified to this, on this issue? Yes, Your Honor, that's correct. And the board credited Dr. Wolfe's testimony. There was competing expert testimony on this particular issue, on the Johnson analysis, Your Honor. The board weighed both experts and found that Dr. Wolfe's testimony should be credited because it was consistent with the claims, consistent with the intrinsic record. I called it a battle of experts. Is that a correct way of looking at that, you think? Yes, that's how I would understand it, too, Your Honor. I think that's right. Maybe this is neither here nor there in terms of the result, but is this more, in your view, of a substantial evidence question, or is it not, based on the discussion we've had today, is it not really a claim construction question? I don't think it really ought to be a claim construction question, Your Honor. Why not? You've demonstrated quite clearly, and maybe even persuasively, that there were two alternative claim constructions in play here, and the board adopted yours and not this very broad, related-to-anything-in-the-game program. Yes, thank you, Your Honor. The reason is that they didn't appeal the construction of the term read. So had they just appealed the construction of the term read, I would agree that this is a claim construction issue that was presented below clearly, consistently, had they appealed the term read. They didn't do that. And for some reason, instead, they switched on appeal to this court and attached that reasoning to this new authentication-first limitation, and that was not presented below. The board never addressed the claim construction for the authentication-first limitation. So that's why I responded that it should be a substantial evidence case, Your Honor. Turning to that substantial evidence, in Johnson, at Column 3, Johnson directly addresses this. So Johnson says... In order for you to win, do we need to find forfeiture of any of the claim construction issues? No, Your Honor. No. It'd be sufficient to find that the board's claim construction is correct and that appellant's construction is incorrect for the reasons that I laid out. The appellant's construction is inconsistent with Claim 1. If we agreed with you on this issue, is that dispositive of the case? Yes, I think it ought to be, Your Honor. There's this secondary issue involving the dependent claims, 2, 3, and 5, and 6, and I'm happy to address those, Your Honor. But as for independent claims 1 and 4, yes, if you agree on claim construction, I think that is dispositive. I didn't understand your answer, Judge Reynolds. So we do not have to reach the issue regarding the dependent claims? No, I'm sorry. You do. There's two issues on appeal. One is the independent claims 1 and 4. I think the claim construction issue would resolve that. The second issue is they challenge the sufficiency of the evidence as to the dependent claims, and so I can walk through that. So Claims 2 and 3 and 5 and 6 involve basically a two-step process. There's two CPUs and there's a two-step process. There's a preliminary authentication program, and what that does is then that authenticates the authentication program, and then there's a second CPU that runs that authentication program, and that authenticates the data, and that's how this works. We relied mainly on two prior art references for this concept of two CPUs and two authentication programs. There's a reference called Diamond, and in Figure 2 in Diamond, it's a flow chart, and it lays out exactly that there's a preliminary authentication program and then there's a secondary authentication program. And then we also relied on a prior art reference called Martinet, and Martinet teaches two boards. So there's a computer, there's a main computer, and then there's a secondary board, and that secondary board also has a CPU, so you've got a computer with a processor, you've got a secondary board also with a processor. And here's the key piece of this is Martinet says the purpose of this board is to function as a gate, function as a gate to prevent unauthenticated information from being communicated from this first board onto the main computer. And the board relied on that and said there's express motivation from Martinet because of this discussion of a gate. There's express motivation to combine Martinet with the preliminary authentication program in Diamond and to use those in combination with Johnson to apply to the dependent claims. And so what's really going on, Diamond has some details on the software, on the preliminary authentication program and the secondary authentication program, and then Martinet goes into specific detail about the hardware. But they're both accomplishing the same thing. They're acting as a gate to prevent information that's not authenticated from being communicated from a first board onto the main computer. Can I just, before your time runs out, can I just take you back to the first point? Of course, Your Honor. Of the first issue, and did the board find that portions of the game program were copied over before in Johnson or in Morrow? No, Your Honor, the board did not. So even if the construction were game program or portions of the game program, the result would still be the same? That's correct, Your Honor. The board found that the game program was not communicated over prior to authentication. That was the analysis that the board performed, and that was their conclusion based on the evidence below. I guess one question I'll ask you before you, it looks like you're going to sit down, because we have time, would be how you're distinguishing potentially between gaming information and game program. I know that your opposing counsel put a lot of weight on that distinction. Yeah, so in the 540 patent, it uses those terms a couple different ways. In some places it calls it gaming information, and in other places it calls it a game program. I believe in one of the figures in the 540 patent, there's a box that has gaming information and game program together. But our position is that for purposes of these claims, game program is where the focus ought to be, and that's because of the claims for a side game program. You can sit down. Thank you. Thank you. Will we store three minutes of rebuttal? Thank you. The first point I'd like to make is that the board did rely on its construction that no portion of gaming data could be done. It's rejection of the proposed construction that no portion of gaming data can be copied into RAM in its final written decision, and that's at Appendix 41 to 42, where it discusses and rejects BOTMATE's arguments. The second, counsel made an argument that BOTMATE's claim construction should be rejected because the authentication program is copied into memory prior to the conclusion of the authentication process. Now, that's addressed by the two CPU claims. That's a special case. It's necessary to bootstrap the authentication software into memory, and in recognition of the potential weakness in the security system, the dependent claims talk about that separate authentication of the authentication program, which is done by a totally separate CPU that has read-only memory, where nothing is written into memory at all. So first you authenticate the authentication program, and only then is it copied into RAM, and only then does the authentication of the other information on the gaming disk take place, and only after that is complete is that gaming data copied into the motherboard's RAM. So that loophole in the security process is addressed and, in fact, is the purpose of the two CPU claims. And even if your honors were to partially reverse unclaimed construction and find that the gaming program itself can't be copied into memory, but perhaps related data, other data from the untrusted source could be copied into memory, then at a minimum a remand would be necessary to apply the correct claim construction because it's clear from those pages identified in the final written decision that the board did not – both for gaming – portions of the gaming data to be copied into memory and other data from the untrusted disk to be copied into memory. And I would just end by pointing to Figure 1 on Appendix 78, which shows that the memory card – this is the untrusted source that can be plugged into the gaming machine – which is Element 30A. And what's discussed throughout the specification is that both of those are authenticated before they can be copied into RAM. And the point of that is you can't trust any data on the memory card until the authentication process is complete. So there's no distinction there between the game program itself or the game system program or the other data on the untrusted memory card. Okay, thank you. Thank you, Your Honor. Thank you. Thank you. We thank both sides.